UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| REBECCA AUGSBURGER,<br><br>     Plaintiff,<br><br>  v.<br><br>NAVY MUTUAL AID ASSOCIATION,<br><br>     Defendant. | CASE NO. 2:17-cv-01817-BAT<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Rebecca Augsburger sues Defendant Navy Mutual Aid Association ("Navy Mutual") for refusing payment under a life insurance contract after the death of her husband, John Augsburger. She alleges Navy Mutual's conduct constitutes a breach of the insurance contract, bad faith, violation of Washington's Consumer Protection Act ("CPA") and Insurance Fair Conduct Act ("IFCA"), negligence, mutual mistake, and that Navy Mutual should be estopped from refusing to pay under the contract. Dkt. 31. Plaintiff seeks reformation of the contract, declaratory judgment, and monetary damages. *Id*.

Navy Mutual moves for summary judgment dismissal of Plaintiff's claims. Dkt. 35. The motion was originally noted for October 19, 2018 and was fully briefed (see Dkts. 39, 40, and 43), but the noting date was stricken and discovery was extended so that the parties could take the deposition of Jennifer Arnic, a former Navy Mutual employee. Dkt. 46. On December 9,

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 1

2019, Plaintiff filed a "Notice of Supplemental Information," with portions of Ms. Arnic's testimony. Dkt. 47. On December 10, 2018, the Court re-noted Defendant's motion for January 4, 2019, and set deadlines for additional briefing (limited to issues raised by Ms. Arnic's testimony). *Id*. Navy Mutual filed its response on December 31, 2018 (Dkt. 50) and Plaintiff filed her reply on January 3, 2019 (Dkt. 52).

On December 27, 2018, Plaintiff filed a motion for partial summary judgment, requesting that the Court find that Navy Mutual "wrongfully denied coverage for the death of John Augsburger, as a matter of law." Dkt. 49. Navy Mutual filed its response on January 14, 2019 (Dkt. 54) and Plaintiff filed her reply on January 18, 2019. Dkt. 55.

The Court finds Navy Mutual is entitled to summary judgment on all of Plaintiff's claims.

## FACTS

Rebecca Augsburger was married to John David Augsburger for nearly 27 years before he died on April 13, 2017. Dkt. 38, Declaration of Emilia L. Sweeney, Ex. B, Rebecca Augsburger Deposition, 9:17-23. In September 2006, the Augsburgers purchased a Decreasing Term Life Insurance Family Plan (Policy #200613863) ("Family Plan") through Navy Mutual. *Id*., Ex. C.

### Navy Mutual

All active duty, reserve, and retired United States military service members are eligible to apply for coverage with Navy Mutual. Dkt. 37, Declaration of Sangeeta Jacob, Senior Vice President of Operations, Information Technology and Insurance Solutions, ¶ 2. Military members who purchase insurance through Navy Mutual become members of the association and policyowners. *Id*. Navy Mutual Owner's Manual, a copy of which was given to Mrs.

Augsburger, details the duties of Navy Mutual, and of the Member, and provides information about the insurance products it offers, as well as what can be found on its website. The Owner's Manual notes that there is a Members Only Site that allows members to fill out and submit applications on-line. Dkt. 36, Declaration of Emilia Sweeney, Ex. A, p. 5. There is no other site on the website that allows an individual to fill out and submit an on-line application. Dkt. 37, Jacob Dec., ¶ 3. To access the Members Only Site, a member is required to enter his or her username and a password. *Id.*; Dkt. 36, Sweeney Dec., p. 5. Members may apply for life insurance on their lives or on the lives of their spouses at any time prior to the insured reaching age 75. *Id.*, Ex. A, p. 9. Usually, the member is the owner of the life insurance plan, though nonmember owner applications are available and the Member can also assign ownership to eligible individuals. *Id.*, Ex. A, p. 9. Widows and widowers who were married to the Member at the time of the Member's death, and who are covered by any benefit plan on their own life automatically become Associate Members. *Id.*, p. 15.

**2006 Family Plan**

Mrs. Augsburger filled out the application for the Family Plan by hand and signed it by hand. Dkt. 36, Sweeney Dec., Ex. B, Augsburger Dep., 11:23-12:15. She understood that it was a decreasing term life insurance policy, but the Augsburgers chose that plan because it was the most cost-effective plan and she was not working at the time. *Id.* at 14:10-15. She also understood that when they were both getting to the age of about 50, they would need to do things to convert their policy. *Id.* Mrs. Augsburger testified that she handled all of the financial and insurance paperwork in their household. Dkt. 36, Ex. A., R. Augsburger Dep., 14:2-3; Dkt. 39-1, Augsburger Dec., ¶ 4.

The Family Plan became effective September 6, 2006, and insured John and Rebecca Augsburger at $400,000 each. Dkt. 38, Sweeney Dec., Ex. B (Family Plan Certificate No. 200613863), Augsburger Dep. Ex. 55; Dkt. 38, Sweeney Dec., Ex. C. Under the terms of the Family Plan, the benefits payable decreased significantly after age 50. *Id*. For example, had the Augsburgers maintained the Family Plan, and paid the premiums due, the benefits payable on the life of John Augsburger would have been but $108,000 as he was 53 years old at the time of his death. Dkt. 37, Declaration of Sangeeta Jacob, ¶ 5. The Family Plan also provided that the policy could be converted:

Conversion Privileges

This plan may be converted to any currently offered life insurance benefit plan, at standard rates and at attained age, without further evidence of insurability, provided conversion is applied for prior to 0001 hours on the Term Coverage Conversion Date. The coverage amount will be based on the applicable amount available for the new plan type chosen and will not exceed the coverage that would be in effect two years following the date of conversion.

Dkt. 38, Sweeney Dec., Ex. C. Conversion is "only a matter of signing a piece of paper, because there is no medical exam." Dkt. 47, Ex. A, Deposition of Jennifer Arnic, 20:12-13.

The Certificate detailed the "Provisions of Benefit Coverage," including the terms used, schedule of benefits, premium due dates/grace period, automatic renewal, conversion privileges, and termination/common disaster or simultaneous death, among other things. Dkt. 36, Sweeney Dec., Ex. C at AUG00008. The Premium Due Date/Grace Period section explained, in pertinent part:

All premiums are due in advance on the premium due date prior to the Term Coverage Termination Date. The premium due date is the anniversary date of the Effective Date. Premiums may be paid monthly, quarterly, semi-annually or annually. A grace period of 30 days from the premium due date will be allowed for the payment of the minimum amount (as notified by the Association) needed to continue the plan in effect. Payment of the minimum amount of premium

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 4

within that grace period will be needed to continue the coverage in effect. The benefit plan will terminate without value at the end of the grace period if the minimum premium payment is not made. …

*Id*. The Termination/Common Disaster or Simultaneous Death section states:

Membership in the Association terminates automatically on the date that neither the Association member nor any family member is covered by a benefit plan. You may terminate this benefit plan at any time upon written notification to the Association. **As a Family Benefit plan, the termination of either member or spouse coverage terminates <u>all</u> coverage.** … (Emphasis in original.)

**2009 Withdrawn Application for $1,000,000 in Coverage**

In 2009, the Augsburgers sought to increase the amount of insurance they had with Navy Mutual to $1,000,000 after John Augsburger retired from the Marine Corps and his income had increased to "$250- plus per year." Dkt. 36, Sweeney Dec., Exhibit B, Augsburger Dep., 15:9-16:23. Again, Mrs. Augsburger filled out the application by hand, and both she and her husband signed the application. *Id.* They didn't go forward with that application because it was a daunting task gathering all the medical information that underwriting wanted when they had an eight year-old, a ten year-old, and an 11 year-old at the time. *Id.*, 16:10-17:17. Mrs. Augsburger decided she didn't have the time to complete the application and would "just let it ride" at the time, which is "one of [her] biggest regrets." *Id.*

**Purchase of Level II 'Plus' Plan**

Navy Mutual reminded John Augsburger that he could convert the Family Plan before benefits began to decrease by letter dated September 13, 2010. Dkt. 36, Sweeney Decl, Ex. D. The letter noted that coverage would begin to decrease soon, and that by electing conversion prior to "your" birthday, the full coverage amount could be converted without further proof of insurability. *Id.* The letter outlined three potential options: 1) do nothing, and maintain the Family Plan until it expires or; 2) convert [John Augsburger's] Family Plan coverage to one of

several individual products offered by Navy Mutual and 3) convert [Rebecca Augsburger's] Family Plan coverage to one of several individual products offered by Navy Mutual. *Id*. The letter also stated that the "total amount of coverage must not exceed [the] current Family Plan coverage amount." *Id*.

On December 10, 2010, Navy Mutual employee Jennifer Arnic sent the following email to an account shared by "JD and Becky Augsburger":

> Did you get the letter we sent out in the mail about the conversion capability of your policy prior to your next birthday? We offer this because of the **decrease** in death benefit of your current policy.
>
> I'm happy to discuss your options with you and answer any questions you might have. Feel free to call or email me at your convenience.

Dkt. 36, Sweeney Dec., Ex. E (Exhibit 60 to Augsburger's Dep. (AUG000049)) (emphasis in original). On December 13, 2010, Plaintiff and Ms. Arnic exchanged the following emails:

> [Plaintiff]: I thought it was just general information for when I turn 50; which is when I thought I needed to convert our policy to the Phase 2…. Why will the death benefit decrease this year? Or will it?
>
> [Arnic]: It decreases at age 50. Only reason we contact at age 47 is because of the guaranteed convertability. You're able to convert the full amount of coverage without a medical exam prior to turning 48 if you're interested.
>
> [Plaintiff]: What is the cost difference per month? Right now we pay $19/person/month. Would it be converting just me, or JD too?
>
> [Arnic]: $400,000 on you for 20 years would be $34.80 per month if you medically qualify for the best rate. For JD it would be $47.60.

Dkt. 36, Sweeney Dec., Exhibit F (Exhibit 61 to Augsburger's Dep. (AUG000051)).

On December 20, 2010, an online application for Level II 'Plus" coverage was submitted to Navy Mutual. According to Sangeeta Jacob, Navy Mutual's Senior Vice President of Operations, Information Technology and Insurance Solutions, the online application process may

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 6

be accessed only by policy owners who are the military members of the association, or by Navy Mutual staff with appropriate permission from the policy owner or member. Dkt. 37, Jacob Dec., ¶ 3. The portal login page records who opened and who filled out any particular application. *Id.* at ¶ 3. The portal login page on December 20, 2010 shows the login credentials for Col. Augsburger. *Id.*; NAV0697, Ex. C.

Plaintiff does not believe that she or her husband submitted the online application because when she submitted applications to Navy Mutual in the past, she filled them out by hand and both she and her husband signed them by hand. She does not remember submitting an application online and does not believe it was something she would have done at that time. Dkt. 39-1, Declaration of Rebecca Augsburger, ¶ 4.

Jennifer Arnic, who exchanged emails with Plaintiff on December 10, 2010, testified that she sometimes filled-out applications on behalf of customers while she was on the telephone with the customer. Dkt. 47, Ex. A, Arnic Dep., pp. 28-29, 33-34. Ms. Arnic had no recollection of and "no idea" about Plaintiff, John Augsburger, or Plaintiff's claims. Dkt. 51, Sweeney Dec., Ex. A, Arnic Dep., 21:15-18; 21:19-22:6; 23:12-22; 24:21-22; 25:1-5; 27:10-12; 28:6-8; 29:3-12; 30:16-19; 32:5-19; 34:14-18. However, after reviewing relevant documents, Ms. Arnic testified it was possible she helped Plaintiff with the application process. Dkt. 47, Ex. A, Arnic Dep., p. 30. Although she thought a person could do a policy conversion through their online system, she did not remember for sure. *Id.* She also did not remember whether the Augsburgers had the option of converting the policy for just one of them and then decide to convert John's policy at a later date. Dkt. 51, Sweeney Dec., Ex. A, Arnic Dep, 21:15-22:1-6. She did, however, remember that a Family Plan could be converted to another policy for the full amount or less than the full amount, but not for more than the full amount. *Id.*, 6:5-13. She also remembered that if a policy

was converted for $400,000 to a level term policy, it would not decrease for whatever term it was purchased for, whether for two years, or for twenty-eight. *Id.*, 22:17-21.

Ms. Arnic created a "Task" record on December 20, 2010; the "Task" and "Subject" fields state "Applied 201089973", which matches the December 20, 2010 online application. Dkt. No. 39-2, p. 54. Under the comment portion on the task record, Ms. Arnic had written: "She'll call me when they decide what they want to do on John." *Id.* When asked what this meant, Ms. Arnic testified "so it looks like maybe she applied for a policy on her and that she needed to decide what she was going to do on John." Dkt. 51, Sweeney Dec., Ex. A, Arnic Dep., 26:20:22-27:1. In Ms. Arnic's experience, the Family Plan was a pretty common policy, she would help people convert the plan if they wanted to, but "some people didn't get any coverage after this claim." *Id.*, 35:16-36:4.

The online application indicated it was replacing Family Plan No. 200613863 with a Level II 'Plus' Plan in the amount of $410,000 to insure Rebecca Augsburger, for a monthly premium of $44.28. Dkt. 37, Jacob Dec., Ex. B (NAV0643-46). Thus, the Level II 'Plus' Plan was for more than the full amount of the Family Plan (*see* Dkt. 51, Sweeney Dec., Ex A, Arnic Dep., 18:5-13; 19:6-12 (conversion of the Family Plan could occur for less than the amount insuring the lives under the Family Plan, but not for more)).

On December 23, 2010, three days after the online application was submitted, Navy Mutual sent an email to John Augsburger, notifying Col. Augsburger that he was canceling the Family Plan to insure his wife under the Level II 'Plus' Plan, but that the new plan did not provide coverage on his life. Dkt. 51, Sweeney Dec., Ex. G. Navy Mutual sent the email to the same email address that Mrs. Augsburger had used to communicate with Navy Mutual just three

days prior. Specifically, the email thanked Col. Augsburger for the application requesting Level II 'Plus' coverage, but noted:

> We note that you are canceling your existing Family Plan #200613863 in favor of this application for Level II 'Plus' coverage. **This new plan provides coverage on your spouse's life, but not on you. Once the Family Plan is canceled, the coverage that exists under the Family Plan on both lives will terminate.**
>
> If you wish decreasing term coverage to continue on your life, please reply to this message and let us know. If you wish to purchase Permanent 'Plus' or Level II 'Plus" coverage on your life to replace the coverage lost when the Family Plan is terminated, please contact a sales representative at 1-800-628-6011, option 2, to obtain quotes, or apply online at www.navymutual.org. If you decide to apply for another benefit plan, please also advise us of your intentions by replying to this email.

*Id*. (emphasis added). The email further asked that if Col. Augsburger wished decreasing term coverage to continue on his life, to reply to the email, or, if he wished to replace the coverage lost when the Family Plan was terminated with another individual policy, he could contact a sales representative or apply online. In either case, he was asked to reply to the email. *Id*. Neither Col. Augsburger nor Mrs. Augsburger replied. In her declaration, Ms. Augsburger clams that she never received "any warning from Navy Mutual that [her] husband's life insurance coverage was being terminated." Dkt. 39-1, ¶ 10. Even if the Court is to infer from this statement that she never received the December 23, 2010 email, which specifically notified the Augsburgers of that very fact, she acknowledges she received an email from Navy Mutual sent to the same email address just three days prior, on December 20, and responded to an email sent on December 29, just six days later, sent to the same email address.

On December 29, 2010, Raymond L. Clark from Navy Mutual's Underwriting Department sent an email to the Augsburgers' email, addressed to Rebecca R. Augsburger, stating: "Thank you for your application requesting Level II 'Plus' term coverage with Navy

Mutual, as submitted by your husband, JOHN D. AUGSBURGER." Dkt. 51, Sweeney Dec., Ex. H. Mr. Clark asked Plaintiff to provide medical information to assess her insurability. *Id*. Plaintiff complied with the request, using the email as a cover page, and indicated in her own handwriting "[p]lease find the requested info attached…." *Id.*; Exhibit B, R. Augsburger Dep., 40:4-25 (Ex. 65 to Augsburger Dep. (AUG000050).

On March 28, 2011, Navy Mutual sent a letter to John Augsburger to advise him that his application for spouse Level II 'Plus' Term life insurance on the life of Rebecca Augsburger had been approved at the standard rate of $61.91, rather than the applied-for rate of $44.28. Dkt. 36, Sweeney Dec., Ex. I (Ex. 66 to Augsburger Dep. AUG000109). Plaintiff wrote $185.73 at the bottom of the letter, which represented the amount of the quarterly premium. *Id*., Ex. B, R. Augsburger Dep., 41:6-42:5; Ex. I. Mrs. Augsburger completed and signed the Premium Acceptance Form, which accompanied the March 28, 2011 letter. The Premium Acceptance Form indicated the "Proposed Insured" as "REBECCA AUGSBURGER." Mrs. Augsburger checked the option: "I agree to accept the premium of $61.91. I have submitted payment in the amount of $185.73 to activate coverage. *Id*., Ex. B, R. Augsburger Dep., 42:10-21 (Ex. 67 to Augsburger Dep. AUG000157); Ex. J (Premium Acceptance Form).

From September 6, 2006 through December 20, 2010, the Augsburgers paid $114.00 per quarter ($57.00 for "Member" and $57.00 for "Spouse") for the Family Plan. Dkt. 37, p. 18. Navy Mutual's records reflect that the Augsburgers made their last premium payment under the Family Plan on December 6, 2010. *Id.*, p. 19. Navy Mutual sent a "Reminder Notice" to John Augsburger that the premium for the Family Plan was overdue. Dkt. 36, Ex. B, R. Augsburger Dep., 44:3-17 (Ex. 68 to Augsburger Dep). The Notice indicated that unless payment was

received by April 19, 2011, "coverage will lapse." *Id.*, Ex. K. Navy Mutual's records reflect that the Augsburgers paid no further premiums on the Family Plan. Dkt. 37, p. 19.

On April 27, 2011, Mrs. Augsburger accepted the new premium of $61.91 under Policy Number 201089973, her Level II 'Plus' Plan, at the increased level of $410,000 for a period of twenty years. Dkt. 36, p. 58. The premium history for the Level II 'Plus' Plan reflects that Mrs. Augsburger's first premium payment of $371.46 for six months' of coverage was received by Navy Mutual on April 27, 2011 (coverage from 12/20/2011 through 6/20/2011). Thereafter, Mrs. Augsburger made payments of $185.73 every three months, and presumably is still making those payments. Dkt. 37, p. 20.

On April 30, 2011, a letter with the new policy for Level II 'Plus' Term Coverage showing Rebecca Augsburger as the insured was sent to John Augsburger. The Benefit Plan Notes indicate:

> 1. Per your request, benefit plan # 200613863 was **terminated** in favor of this plan.

Dkt. 36, Sweeney Dec., Exhibit L (Exhibit 70 to the Augsburger Dep. at AUG000075) (emphasis added).

**Claim for Benefits**

Col. Augsburger died April 13, 2017. Dkt. 36, Sweeney Dec., Exhibit B, R. Augsburger Dep., 52:20-22. Mrs. Augsburger submitted her claim for benefits online. *Id.* at 53:19. She input his number – she is not exactly sure which number she input, but it was whatever number she had on the front of her policy – and was told that policy did not exist. *Id.* at 53:25-54:22. She learned the policy did not exist instantly. *Id.* at 54:23-25. She input the number three or four

more times, thinking she had the number wrong. *Id*. at 55:1-8. She then called Navy Mutual, and was told the policy had been cancelled. *Id*. at 55:9-24.

## SUMMARY JUDGMENT

The Court shall grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (2010). In support of a motion for summary judgment, the moving party need not negate the opponent's claim, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); rather, the moving party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict in favor of the opponent, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted. *See Beard v. Banks*, 548 U.S. 521, 529 (2006).

The moving party bears the burden of showing that there is no evidence which supports an element essential to the non-movant's claim. *Celotex*, 477 U.S. 322. In order to defeat a motion for summary judgment, the non-moving party must make more than conclusory allegations, speculations or argumentative assertions that material facts are in dispute. *Wallis v. JR Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

## DISCUSSION

**A.      Defendant's Motions to Strike Portions of Mrs. Augsburger's Declaration**

Navy Mutual argues that Washington's Deadman Statute (RCW 5.60.030) is applicable to that portion of Mrs. Augsburger's declaration (Dkt. 39-1) purporting to offer testimony that her husband would not have submitted the online application for the 2010 Level II 'Plus' Plan. Mrs. Augsburger counters that the Deadman Statute applies only to actions brought on behalf of

an estate. The Court finds the evidence is admissible because it is based on Mrs. Augsburger's personal knowledge.

Mrs. Augsburger testified that she did not "believe" that either she or her husband submitted the online application because when she submitted applications to Navy Mutual in the past, she filled them out and signed them by hand, she did not remember submitting the application online, and her husband would not have submitted the application because she handled all the financial and insurance paperwork in their household. Dkt. 39-1, Declaration of Rebecca Augsburger, ¶ 4. This testimony is admissible as it is based on Mrs. Augsburger's personal knowledge that she was the person communicating and dealing with all the household insurance and business needs. In addition, Mrs. Augsburger later surmises that it is most likely that Ms. Arnic completed the online application while she was on the telephone with Mrs. Augsburger (Dkt. 43, p. 2), which Ms. Arnic agrees is possible. Dkt. 47, Ex. A, Arnic Dep., p. 30. Accordingly, the Court denies the motion to strike.

**Declaration of Stephen Strzelec**

Mrs. Augsburger submits the declaration of Stephen Strzelec in opposition to Navy Mutual's motion for summary judgment. Dkt. 39-3, Declaration of Stephen Strzelec, Ex. A. Mr. Strzelec opines that Navy Mutual's handling of Mrs. Augsburger's claim "recklessly failed to consider the interests of the insured" and that Navy Mutual "failed to conduct a reasonable investigation of the insurance claim." *Id.* Navy Mutual objects to the testimony based on Mr. Strzelec's lack of qualification and because his testimony does not satisfy Federal Rule of Evidence 702.

Under Rule 702, "expert opinion evidence is admissible if: (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific,

technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the principles and methods to the facts of the case." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014). In evaluating proffered expert testimony, the court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation omitted). Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), "a district court's inquiry into admissibility is a flexible one." *City of Pomona*, 750 F.3d at 1043 (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)). To ensure expert testimony complies with the restrictions laid out in Rule 702 and the gatekeeping mandate of *Daubert*, "the trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Primiano*, 598 F.3d at 564 (quoting *Daubert*, 509 U.S. at 597, 113 S.Ct. at 2799); *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc).

Navy Mutual first challenges Mr. Strzelec's qualifications to render any of the challenged opinions. However, the admissibility hurdle for qualifications is relatively low, and requires only a "minimal foundation of knowledge, skill, and experience." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015–16 (9th Cir.2004). Although Mr. Strzelec's experience is largely with catastrophe, auto and fire insurance, his general knowledge, skill, experience, training, and education in the insurance industry makes him sufficiently qualified.

However, Mr. Strzelec's discussion of the general principles of insurance, claims handling, and the role of an insurance company, does not help "the trier of fact to understand the evidence or to determine a fact in issue" as the role of an insurance company with respect to its

insured is defined by the insurance policy and by state law. Likewise, Mr. Strzelec's listing of numerous Washington laws and regulations are of no benefit as he fails to explain how any of those laws or regulations apply to the issues at hand. Finally, Mr. Strzelec's analysis of Mrs. Augsburger's claim consists mainly of improper legal conclusions (*i.e.*, "investigation into the facts regarding the policy change was not reasonable"; "failed to meet minimum insurance standards"), and includes statements more likely to inflame rather than help the trier of fact understand the evidence (*i.e.* "determined it was more efficient to force their insured into litigation"; "elected to ignore the position of Mrs. Augsburger"; "this may be a "bait and switch" procedure"), all of which are not reliably linked to the principles or methods cited in his report or to the terms of the specific policies at issue. For these reasons, the Court finds that Mr. Strzelec's testimony should be excluded.

**B.      Breach of Contract**

Mrs. Augsburger alleges that "Navy Mutual's conduct breached the contract." Dkt. 31, ¶ 4.1. The only contract referenced in the Second Amended Complaint is the 2006 Family Plan. *See*, Dkt. 31, ¶¶ 1.2, 1.3, 3.1, 3.2, 3.10.

Interpretation of an insurance policy is a question of law. *Overton v. Consol. Ins. Co.*, 145 Wash.2d 417, 424, 38 P.3d 322 (2002). The terms of a policy are given a fair and reasonable construction that would be given to the contract by the average person buying insurance. *Id.* Definitions provided in the policy are controlling, but if a term is undefined, it is given the plain and ordinary meaning found in a standard English dictionary. *Id.* at 38 P.3d 322, 427. In addition, courts should to avoid reading ambiguity into a contract when possible, and to give effect to all of a contract's language. *Eagle West Insurance Company v. SAT, 2400, LLC*, 187 F.Supp.3d 1231, 1239 (2016). Finally, under Washington law, the insured has an affirmative

duty to read her policy and be on notice of the terms and conditions of that policy. *Dombrosky v. Farmers Ins. Co. of Washington*, 54 Wash.App. 245, 257, 928 P.2d 1127 (1996).

Mrs. Augsburger argues the Family Plan could not be terminated without written permission from the Augsburgers or by non-payment; she paid all premiums asked of her, "Navy Mutual continues to accept that premium", and she never received notice of cancellation of the policy for nonpayment of premiums. In her declaration, Mrs. Augsburger quotes "notice" language given to her by her attorney regarding "replacement of insurance" and "terminating or altering existing coverage," and states she does "not remember Navy Mutual ever sending me this information." Dkt. 39-1, ¶¶ 7, 8.

The Family Plan could be terminated in a number of ways, including as pertinent here: (1) without value at the end of the grace period if the minimum premium payment was not made; (2) by the member at any time upon written notification to the Association; and (3) if coverage for either the member or spouse was terminated. Dkt. 36, Sweeney Dec., Ex. C, p. 42 of 64. The summary judgment evidence reflects the Family Plan was terminated without value at the end of the grace period when the minimum premium payment was not made and when the Augsburgers purchased the Level II 'Plus' Plan.

**Non-Payment of Premium on Family Plan Resulted in Lapse**

Non-payment of a life insurance premium results in the forfeiture of the policy. *Graham-Bingham Irrevocable Trust v. John Hancock Life Insurance Company*, USA, 827 F.Supp.2d 1275, 1283 (W.D. WA 2011), *citing Klein v. N.Y. Life Ins. Co.*, 104 U.S. 88, 90, 26 L.Ed. 662 (1881). The Augsburgers paid premiums on the Family Plan of $57.00 each, for a total of $144.00 per month, from September 6, 2006 to December 20, 2010. Dkt. 37, pp. 18-19. On April 27, 2011, Mrs. Augsburger accepted the new premium of $61.91 on her Level II 'Plus' Plan

(with increased coverage of $410,000.00). Dkt. 36, p. 58. Mrs. Augsburger's first premium payment of $371.46 for six months' of coverage ($61.91 x 6) on the Level II 'Plus' Plan was received on April 27, 2011 (coverage from 12/20/2011 through 6/20/2011) and thereafter, Mrs. Augsburger has been paying premiums in the amount of $185.73 every three months. Dkt. 37, p. 20. On the other hand, the Augsburgers paid the quarterly $114.00 premium ($57.00 to insure each of their lives) on the Family Plan until the end of 2010. And, although the Augsburgers received a reminder that coverage would lapse under the Family Plan if a premium payment was not received by April 19, 2011 (Dkt. 36, p. 60), the Augsburgers made no further premium payments of $114.00. In addition, as discussed in more detail below, the evidence reflects that the Augsburgers received several notices from Navy Mutual confirming that purchase of the Level II 'Plus' Plan would and did terminate the Family Plan and specifically, that it terminated coverage for John Augsburger.

Mrs. Augsburger argues that the policy could not have terminated for non-payment of premiums because "the Augsburgers successfully tried to pay everything that was requested of them" and Navy Mutual's representative "confirmed that the Augsburgers paid every premium that was requested by Navy Mutual." Dkt. 55, p. 2. This argument is disingenuous. Although the Augsburgers did not miss a premium payment, the premiums they paid changed as of April 27, 2011, when they stopped paying the Family Plan premium, which insured both their lives, and began paying the Level II 'Plus' Plan premium, which insured only Rebecca Augsburger's life. And, the Augsburgers received timely notice that the Family Plan would lapse if the premium was not paid by April 19, 2011 – well in advance of the date the premium was due and well in advance of Mrs. Augsburger's acceptance of the new premium under the Level II 'Plus' Plan and payment of that premium.

Mrs. Augsburger also argues that Navy Mutual failed to provide notice that the Family Plan was cancelled as required by RCW 48.18.290, but the statute on which she relies does not apply to the lapse of the Family Plan. RCW 48.18.290 prohibits the cancellation of an insurance policy absent the advance notice mandated by the statute. *See Olivine Corp. v. United Capitol Ins. Co.*, 147 Wash.2d 148, 162, 52 P.3d 494 (2002) (interpreting RCW 48.18.290 (1998) ("Cancellation by the insurer ... may be effected as to any interest only upon compliance with the following: (a) Written notice of such cancellation ....". Cancellation of a policy, however, is a unilateral act by the insurer, *see Safeco Ins. Co. v. Irish*, 37 Wash.App. 554, 558, 681 P.2d 1294 (1984), while lapse of a policy is an automatic result of an insured's failure to timely pay a premium.

Navy Mutual did not opt to cancel the Family Plan; rather, the Family Plan lapsed because the non-payment of a life insurance premium results in forfeiture of the policy. *Klein*, 104 U.S. at 90.

### Termination of Member Coverage

The parties do not dispute that the 2010 Level II 'Plus' Plan insures the life of Mrs. Augsburger only, but dispute who submitted the online application for the Level II 'Plus' Plan.

The application shows the log-in credentials for Col. Augsburger and no other log-in or other credentials for a Navy Mutual employee. Ms. Arnic does not specifically remember the Augsburgers or the particular online application, but states she may have assisted with the online application. Mrs. Augsburger speculates that it "makes sense that on December 20 [she] would have given permission to Arnic to log-in to [her husband's] account…." However, Mrs. Augsburger insists that the purpose of the online application was to "convert" the Family Plan to maintain the $400,000 coverage on herself and her husband. Conversely, Ms. Arnic testified that

the online application was for a Level II 'Plus' Plan for Mrs. Augsburger alone with $410,000 of coverage and a Family Plan could not be "converted" for a plan with higher coverage. In addition, after reviewing her note "that [Mrs. Augsburger] was going to call back when they decide what they want to do on John" (*see* Dkt. 51, Sweeney Dec., Ex. A, Arnic Dep., 26:20:22-27:1), Ms. Arnic testified: "so it looks like maybe she applied for a policy on her and that she needed to decide what she was going to do on John."[1]

Whether one of the Augsburgers filled out the application form or Ms. Arnic filled it out on Mrs. Augsburger's behalf, the record reflects that Mrs. Augsburger received several communications from Navy Mutual confirming purchase of the Level II 'Plus' Plan on her life only and confirming that coverage on the life of John Augsburger was terminated unless the Augsburgers took steps to obtain replacement coverage for him.

The December 23, 2010 email notified John Augsburger in clear language that the Level II 'Plus' Plan provided coverage on his wife, but not on him:

> We note that you are canceling your existing Family Plan #2000613863 in favor of this application for Level II 'Plus' coverage. This new plan provides coverage on your spouse's life, but not on you. Once the Family Plan is canceled, the coverage that exists under the Family Plan on both lives will terminate.

---

[1] Counsel's statement that this note "*probably* reflected the Augsburgers' plan to seek $1,000,000 on John again" [a "plan" that voluntarily abandoned by the Augsburgers in 2006] is nothing more than argument and base speculation – neither of which is sufficient to withstand a motion for summary judgment. *See Carrillo-Gonzalez v. I.N.S.*, 353 F.3d 1077, 1079 (9th Cir. 2003) (argument by counsel is not evidence); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (conclusory allegations unsupported by factual data are insufficient to defeat a summary judgment motion); *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 482 (9th Cir. 1994) ("naked allegations and speculation" are insufficient to preclude summary judgment); *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988) ("Sweeping conclusory allegations will not suffice to prevent summary judgment.").

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 19

Dkt. 36, Sweeney Dec., Exhibit G, p. 52 of 64. The email offered several ways of maintaining coverage on Col. Augsburger (*i.e.*, continue decreasing term coverage, purchase permanent 'Plus' or Level II 'Plus' coverage to replace the coverage lost when the Family Plan is terminated), and directed him to contact Navy Mutual, apply online, and/or reply to the email. *Id.* The parties do not dispute that the Augsburgers took no action in response to this email.

Even if the Court assumes that Mrs. Augsburger did not review the December 23, 2010 email – the one that specifically notified the Augsburgers that the "new plan provides coverage on your spouse's life, but not on you" and "once the Family Plan is canceled, the coverage that exists under the Family Plan on both lives will terminate" –the evidence reflects and Mrs. Augsburger acknowledges, that Navy Mutual sent electronic mail to the Augsburgers at the same email address (JDandBecky@comcast.net), and the Augsburgers received several emails both before and after December 23, 2010, advising them that purchase of the Level II 'Plus" Plan would terminate the Family Plan, and leave her husband uninsured.

For example, on December 20, 2010, Mrs. Augsburger and Ms. Arnic exchanged emails regarding the rates for maintaining the Family Plan for 20 years ($82.40 for both). On December 29, 2010, Mrs. Augsburger received the email thanking her for her "application requesting Level II 'Plus' term coverage with Navy Mutual, as submitted by your husband, JOHN D. AUGSBURGER…." and asking that she supply additional medical information. Mrs. Augsburger did not question the assertion that the application was submitted by her husband, but complied with that request by writing across the top of that same letter "[p]lease find requested info attached…10 sheets total." Dkt. 36, Sweeney Dec., Ex. H, p. 54 of 64.

Mrs. Augsburger also does not dispute that on March 28, 2011, she received the letter addressed to Col. Augsburger, letting him know that his application "for spouse Level II 'Plus'

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 20

Term life insurance" had been approved and with that letter, she received the Premium

Acceptance Form, which she signed (with a premium of $61.91). *Id.*, Exs. I and J. On April 30,

2011, she received her new benefit package plan, which stated in pertinent part, that "[p]er your

request, benefit plan #200613863 was terminated in favor of this plan." Dkt. 36, Sweeney Dec.,

Exhibit L, p. 64 of 64.

Mrs. Augsburger also contends that Navy Mutual sent no notice of cancellation, but as

previously noted, Navy Mutual mailed a **\*\* REMINDER NOTICE \*\*** to Col. Augsburger

advising that coverage under the Family Plan would lapse if a premium payment of $114.00 was

not received by April 19, 2011. Dkt. 36, p. 60 of 64 (Ex. 64 to Mrs. Augsburger's Dep.)

However, on April 27, 2011, the Augsburgers paid $371.46 (six months' coverage at $61.91 per

month) on the Level II 'Plus' Plan for coverage on Mrs. Augsburger and did not pay the existing

premium of $114.00 on the Family Plan (for three months' coverage at $57.00 each). Dkt. 37,

pp. 18-20. Moreover, there is no evidence that the Augsburgers took any steps to maintain the

Family Plan for 20 years (as was discussed in Mrs. Augsburger's emails with Ms. Arnic) at the

quoted premium rate of $82.40 per month ($34.80 for her and $47.60 for John) – an increase

from the $38.00 ($19.00 per person) they had been paying on the Family Plan.

Even if the Court assumes that Mrs. Augsburger believed at the time she was talking to

Ms. Arnic that they were merely "tweaking" the existing coverage in the Family Plan, Navy

Mutual sent the Augsburgers an email three days after the online application was submitted,

advising that the application only sought insurance for the life of Rebecca Augsburger, but not

the life of John Augsburger.  Neither Col. Augsburger nor Mrs. Augsburger replied directly to

that email, or reached out to Navy Mutual in any other way to make sure that the life of John

Augsburger was insured. Ms. Arnic's note during her conversation with Mrs. Augsburger also

reflects that Mrs. Augsburger was aware that additional steps needed to be taken with regard to coverage for her husband. And, the Benefit Plan Notes attached to the Level II 'Plus' Term Coverage insuring the life of Rebecca Augsburger indicated that the Family Plan had been terminated in favor of the policy insuring the life of Rebecca Augsburger in April of 2011. Therefore, when John Augsburger died six years later, in April of 2017, the Family Plan no longer existed. There was no contract to breach, as the contract no longer existed.

Navy Mutual also argues and the Court agrees, that the statute of limitation bars Mrs. Augsburger's action for breach of contract. Actions based on a written contract are subject to a six-year statute of limitations. RCW 4.16.040. A cause of action accrues when a party has a right to apply to the court for relief. *Campbell v. Loftus*, 36 Wn.App. 678, 679, 676 P.2d 1025 (1984). Thus, if Navy Mutual wrongly cancelled the policy on Col. Augsburger, Mrs. Augsburger knew or should have known that she had a right to seek relief at the latest, by April 30, 2011 when she had received the Certificate of Insurance for the Level II 'Plus' Term policy, which noted "[p]er your request, benefit plan #200613863 was terminated in favor of this plan." Dkt. 36, Sweeney Dec., Exhibit L, p. 64 of 64.

**B.      Bad Faith**

Mrs. Augsburger complains that Navy Mutual treated her unfairly, placed its own interests above hers, and that its acts and omissions violated the Washington Administrative Code. Dkt. 31, ¶ 5.1. Mrs. Augsburger contends Navy Mutual violated three provisions of WAC 284-30-330:

- Failure to conduct a timely and adequate investigation
- Denial of the claim before completing an adequate investigation
- Forcing the insured into litigation to receive a reasonable investigation and to recover benefits.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 22

Insurers have a duty of good faith to their policyholders; violations of that duty may give rise to tort actions for bad faith. *Smith v. Safeco Ins. Co.*, 150 Wash.2d 478, 484, 78 P.3d 1274 (2003). "Whether an insurer acted in bad faith is a question of fact." *Id*. However, questions of fact may be determined as a matter of law if reasonable minds could reach but one conclusion. *Id*. at 485, 78 P.3d 1274. To prevail on a claim of bad faith denial of coverage, the insured must come forward with evidence that the insurer acted unreasonably. *Smith*, 150 Wash.2d at 486, 78 P.3d 1274. If the insurer presents a reasonable basis for its action, the insured may raise a question of material fact by presenting evidence that the insurer's alleged basis was not the actual basis for denying coverage. *Id*.

An insurer must make a good faith investigation of the facts before denying coverage and may not deny coverage based on a defense that reasonable investigation would have proved to be without merit. *Indus. Indem. Co. of the N.W., Inc. v. Kallevig*, 114 Wash.2d 907, 917, 792 P.2d 520 (1990). Because an insurer's duty of good faith is separate from its duty to indemnify, an insured may maintain an action for bad faith investigation of the claim even if the insurer was ultimately correct in denying coverage. *Coventry Assocs. v. Am. States Ins. Co.*, 136 Wash.2d 269, 279, 961 P.2d 933 (1998).

According to Navy Mutual's Senior VP of Operations, IT and Insurance Solutions, the typical investigation of claims on the life insurance products involves just a few questions: (1) is there proof of the insured's death? (2) was the policy in-force at the time of death? (3) is a claim being made by or on behalf of the designated beneficiary or beneficiaries? (4) were the premiums paid current? (5) is there a loan on the policy? Dkt. 37, Jacob Decl. at ¶ 9. Once these questions are verified and confirmed, Navy Mutual settles the claim. *Id*. When Mrs. Augsburger contacted Navy Mutual to file a claim, research quickly revealed that the Family Plan, the only

policy Navy Mutual ever issued on Col. Augsburger's life, was not in force and had not been in force for several years. *Id.* Mrs. Augsburger was immediately advised in May of 2017 that there was no coverage currently in place on her husband.

Mrs. Augsburger argues that Navy Mutual's investigation of the claim was extremely limited and that Navy Mutual failed to investigate whether an employee "might have filled-out that application" and that such a termination "would have been illogical and contrary to the Augsburgers' interests." Dkt. 39, pp. 9-10. However, the evidence does not support a claim of bad faith. The Family Plan clearly stated that terminating coverage for the member or the spouse would terminate coverage for both. While Navy Mutual was processing the application for the Level II 'Plus' Plan on the life of Rebecca Augsburger, the Augsburgers received notice that the life of John Augsburger would not be covered by the new application and that he should take steps to obtain coverage. The Augsburgers received notice again when they were issued the Certificate for Level II 'Plus' Term Plan insuring Rebecca Augsburger. Therefore, it was not unreasonable for Navy Mutual to deny benefits from a policy that had not been in force for more than six years before a claim was made.

Navy Mutual was not under a duty to determine whether one of the Augsburgers applied online for the Level II 'Plus' Plan or whether they applied online with the assistance of a Navy Mutual employee. Nor was Navy Mutual under a duty to investigate the Augsburgers' "intent" when they had received ample notice; they could have maintained coverage on the Family Plan by continuing to pay those premiums or converted it to the full amount of coverage for a higher premium; they were not obligated to accept the Level II 'Plus' Plan or pay those premiums; and, they could have obtained coverage on John Augsburger's life at any time after their coverage under the Family Plan terminated.

1    Mrs. Augsburger argues that the Court may infer from her 2009 attempt to obtain $1

2    million in coverage (which she did not have time to complete) and John's increased salary after

3    his retirement from the military, that the Augsburgers would never have wanted to terminate

4    coverage on John's life. However, the Augsburgers were free to choose from any number of life

5    insurance products and could contract with any life insurer. The evidence reflects that Navy

6    Mutual flagged the lack of insurance for John Augsburger three days after the application on the

7    life of Rebecca Augsburger was submitted, and the policy insuring Rebecca Augsburger clearly

8    noting that the Family Plan had been terminated was mailed to the Augsburgers on April 30,

9    2011. Thus, the Court finds Navy Mutual did not act in bad faith and is entitled to summary

10   judgment on this claim.

11   **C.    Consumer Protection Act**

12       The CPA provides that unfair or deceptive acts in the conduct of trade or commerce are

13   unlawful. RCW 19.86.020. To prevail on a CPA claim, the claimant must provide evidence of

14   (1) an unfair or deceptive act or practice in trade or commerce that impacts public interest, and

15   (2) resulting injury to the claimant's business or property. *James E. Torina Fine Homes, Inc. v.*

16   *Mut. of Enumclaw Ins. Co.*, 118 Wash.App. 12, 20, 74 P.3d 648 (2003), *review denied*, 151

17   Wash.2d 1010, 89 P.3d 712 (2004). Any act that qualifies as an unfair claims settlement practice

18   in WAC 284–30–330 constitutes a per se unfair trade practice impacting public interest. *Id*. at

19   20–21, 74 P.3d 648 (citing *Kallevig*, 114 Wash.2d at 923, 792 P.2d 520). "The question of

20   whether an act or practice is actionable under the Consumer Protection Act is a question of law."

21   *Dombrosky*, 84 Wash.App. at 260, 928 P.2d 1127; *see also Leingang v. Pierce County Med.*

22   *Bureau, Inc.*, 131 Wash.2d 133, 150, 930 P.2d 288 (1997).

23

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 25

1  Mrs. Augsburger alleges that "Navy Mutual's conduct, including, but not limited to, its

2  bad faith and its violations of the Washington Administrative Code, constituted violations of the

3  Washington Protection Act, RCW 19.86 et seq." Dkt. 31, ¶ 6.1.

4       A reasonable basis for denying coverage constitutes a complete defense to any claim that

5  the insurer denied coverage in bad faith or in violation of the CPA. *Dombrosky*, 84 Wn.App. at

6  260, 928 P.2d 1127. As discussed above, Navy Mutual did not act in bad faith and had a

7  reasonable basis for denying coverage under the Family Plan. In addition, Mrs. Augsburger's

8  CPA claim is time-barred as claims based on a violation of the CPA are subject to a four-year

9  statute of limitations. RCW 19.86.120. Mrs. Augsburger knew, or should have known no later

10 than May of 2011 that the Family Plan had been terminated but she did not bring her CPA claim

11 until November 2017. Thus, Navy Mutual is entitled to summary judgment on the CPA claim.

12 **D.     Insurance Fair Conduct Act ("IFCA")**

13      The IFCA explicitly creates a cause of action for first party insureds who were

14 "unreasonably denied a claim for coverage or payment of benefits." RCW 48.30.015(1). The

15 IFCA does not create an independent cause of action for regulatory violations. *Perez-Crisantos*

16 *v. State Farm Fire and Casualty Company*, 187 Wash.2d 669, 684 (2017).

17      Mrs. Augsburger alleges "Defendant's conduct constituted violations of the Insurance

18 Fair Conduct Act," Dkt. 31, ¶ 7.1. As the only basis on which she may recover is if Navy Mutual

19 unreasonably denied her claim for coverage or benefits, this claim is denied as the Court has

20 previously found that Navy Mutual's denial was reasonable.

21

22 **E.     Estoppel and Equitable Estoppel**

23

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 26

The leading case in Washington regarding equitable estoppel as applied to insurance companies is *Saunders v. Lloyd's of London*, 113 Wash.2d 330, 779 P.2d 249 (1989). The elements of equitable estoppel are: (1) an admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of this admission, statement, or act; (3) injury to such other party resulting from allowing the first party to contradict or repudiate the admission, statement, or act. *Saunders*, 113 Wash.2d at 340, 779 P.2d 249. The elements of estoppel are nearly identical. *See Deacy v. College Life Insurance Co. of America*, 25 Wash. App. 419, 424 (1980). Under appropriate circumstances, an insurer may be equitably estopped to deny reinstatement and backdating of a policy upon receipt of an insured's late payment. In order for equitable estoppel to apply, however, there must be an established course of dealing between the parties such as an insurer's practice of accepting late payments and backdating coverage without notifying the insured of any gap in coverage or providing a refund. *Id*. at 342-343.

Mrs. Augsburger asks this Court to apply the equitable remedies of estoppel and equitable estoppel by alleging that "Defendant should be estopped from refusing payment due to Defendant's conduct and failure to comply with applicable law." Dkt. 31, ¶ 8.1. Navy Mutual allegedly refused to pay policy benefits after the death of John Augsburger (¶3.8); refused to upgrade the Augsburgers' policy (*id*. at ¶3.11); failed to adequately assist the Augsburgers to upgrade and maintain their policies (*id*. at ¶3.14); and, cancelled coverage on John Augsburger while upgrading coverage on Rebecca Augsburger (*id*. at ¶3.15).

However, the record reflects that Navy Mutual consistently advised that termination of coverage by one terminates coverage for all in the language of the Family Plan, in communications sent to the Augsburgers during the processing and finalizing of Mrs. Augsburger's Level II 'Plus' Plan, and in the Plan Benefit Notes sent to the Augsburgers when

the Level II 'Plus' Plan on Mrs. Augsburger incepted. Navy Mutual also sent timely notice that premiums on the Family Plan were due, the policy would lapse for non-payment, and there is no evidence the Augsburgers ever attempted to tender late payment.

Accordingly, Navy Mutual is entitled to summary judgment on Mrs. Augsburger's claim for estoppel and equitable estoppel.

## F. Negligence

The essential elements of negligence are: (1) the existence of a duty owed to the complaining party; (2) a breach; (3) resulting injury; and (4) proximate cause between the claimed breach and resulting injury. *Ripley v. Lanzer*, 152 Wash.App. 296, 323, 215 P.3d 1020 (2009). Mrs. Augsburger alleges Navy Mutual negligently failed to properly communicate with her; failed to assist and comply with her intent to maintain all coverages and upgrade the policy, and; failed to convert the policy. Dkt 31, ¶¶ 9.1, 9.2, 9.3.

As previously noted, insureds have an affirmative duty under Washington law to read their policies and be on notice of the terms and conditions of the policies. *Dombrosky v. Farmers Ins. Co. of Washington*, 54 Wash. App. 245, 257, 928 P.2d 1127 (1996). The record reflects that Navy Mutual warned that termination of one coverage terminated all coverage in the terms of the policy, flagged that issue again after Col. Augsburger applied for insurance on the life of his wife, and notified the Augsburgers that the Family Plan had been terminated in April of 2011.

Even assuming Navy Mutual was negligent in failing to "convert" the Family Plan as Mrs. Augsburger alleges, any such action is barred by the three year statute of limitations. Mrs. Augsburger filed suit in November of 2017. This was more than three years after the alleged negligent act occurred. *See* RCW 4.16.080 (Negligence is a tort; there is a three-year statute of limitations for tort claims). Even if Mrs. Augsburger believed she was "tweaking" her coverage

or "converting" the Family Plan, Navy Mutual advised the Augsburgers before the Level II 'Plus' Plan came into effect that it was not a conversion of the existing plan, but was a new plan covering only her life, that steps had to be taken to cover the life of Col. Augsburger, and that once the Level II 'Plus' Plan incepted, the Family Plan terminated. Thus, Mrs. Augsburger knew, or should have known in the spring of 2011 that she had a right to seek relief more than six years before she brought suit.

Based on the foregoing, the Court finds Navy Mutual is entitled to summary judgment on Mrs. Augsburger's negligence claim.

## G. Reformation of Contract

Mutual mistake will support reformation of a contract where the contracting parties had identical intentions but the writing materially varies from that intent. *Denny's Rests., Inc. v. Sec. Union Title Ins. Co.*, 71 Wash.App. 194, 212, 859 P.2d 619 (1993). Contracts are not reformed for mistake; writings are. *A & A Sign Co. v. Maughan*, 419 F.2d 1152, 1156 (9th Cir. 1969). "The mistake must be proved by clear, cogent and convincing evidence, and if doubts exist as to the parties' intent, reformation is not appropriate." *Denny's Rests.*, 71 Wash.App. at 212, 859 P.2d 619. "Reformation is not a proper remedy for the enforcement of terms to which the defendant never assented." 7 Joseph M. Perillo, CORBIN ON CONTRACTS § 28.45 at 302 (rev. ed. 2002). Moreover, "[t]he unexpressed intention of one party is meaningless as to the mutual intention of the parties." *Am. States Ins. Co. v. Breesnee*, 49 Wash.App. 642, 646, 745 P.2d 518 (1987).

Mrs. Augsburger contends "[t]he contract should be reformed to reflect the intent of the Augsburgers." Dkt. 31, ¶10.1. However, reformation is not a proper remedy for the enforcement of terms to which the defendant never assented. *West Coast Pizza v. United National Insurance*

*Company*, 166 Wash.App. 33, 41 (2011) (citations omitted). There is no evidence that Navy Mutual intended that Col. Augsburger should remain insured on a policy that was replaced by a policy on the life of Ms. Augsburger, and for which no premiums were paid following replacement and termination of that policy.

Mrs. Augsburger also claims mutual mistake in modifying the coverage, alleging only "[i]f both parties made a mistake in modifying the coverage, the contract should be reformed accordingly." Dkt. 31, ¶ 11.1.

Under Washington law, a mutual mistake occurs "when the parties, although sharing an identical intent when they formed a written document, did not express that intent in the document." *Halbert v. Forney*, 88 Wash.App. 669, 674, 945 P.2d 1137 (1997). *Accord Rocky Mountain Fire & Cas. Co. v. Rose*, 62 Wash.2d 896, 903, 385 P.2d 45, 1 A.L.R.3d 876 (1963). The rationale behind such a rule is that, but for the mistake, the parties would have executed the reformed contracts. *See Halbert*, 88 Wash.App. at 674, 945 P.2d 1137. *Accord Stahl v. Schwartz*, 67 Wash. 25, 33, 120 P. 856 (1912) (*citing Kowalke v. Milwaukee Elec. Ry. & Light Co.*, 103 Wis. 472, 79 N.W. 762 (1899)).

The test for mutuality of mistake requires the mistaken fact be the underlying basis of the entire agreement and, when discovered, that the essence of the agreement is destroyed. *Childers v. Alexander*, 18 Wash.App. 706, 709, 571 P.2d 591 (1977). *Accord Chemical Bank v. Washington Pub. Power Supply Sys.*, 102 Wash.2d 874, 899, 691 P.2d 524 (1984) (quoting Restatement (Second) of Contracts § 152 (1981)).

Here, Mrs. Augsburger infers that both sides, when they formed the Level II 'Plus' Plan, mistakenly believed that they were "converting" and "maintaining" existing coverage of the Family Plan for both Col. Augsburger and Mrs. Augsburger and therefore, this mistake justifies

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 30

reformation of the Level II 'Plus" Plan insurance contract (which is the only contract that now exists). Reformation is justified only if the parties' intention were identical at the time of the transaction. *See Childers*, 18 Wash.App. at 710, 571 P.2d 591. Although the evidence reflects that Navy Mutual initially contacted Mrs. Augsburger regarding the Family Plan and emails were exchanged discussing the cost of maintaining and/or converting the Family Plan, if this was Mrs. Augsburger's "expectation," she never followed through with it or communicated it to Navy Mutual (and in fact, she did not herself take advantage of the conversion, as she obtained a policy for $410,000). It is clear from the record that Navy Mutual did not intend the Level II 'Plus' Plan to maintain and/or convert the Family Plan and clearly communicated this to the Augsburgers. In addition, the record reflects that Mrs. Augsburger had constructive knowledge that the policy insuring her life terminated coverage under the Family Plan and therefore, she did not hold a mistaken belief. *See Denaxas v. Sandstone Court of Bellevue, L.L.C,* 148 Wash. 2d 654, 668, 63 P.3d 125, 131 (2003) (A party with constructive knowledge of the circumstances giving rise to the alleged mistake does not hold a belief not in accord with the facts.)

Additionally, as noted by Navy Mutual, Mrs. Augsburger's claim for reformation is time-barred. *See*, *Browning v. Howerton*, 92 Wash.App. 644, 649 (1998) – where parol evidence shows that both parties were mistaken about a basic assumption underlying a written agreement, the contract is voidable and the six-year statute applies but, where the parties seek to reform a material term, the three-year statute of limitation applies. *Id*. at 650.

Because there was no mutual mistake, Navy Mutual is entitled to summary judgment on this claim.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 31

**CONCLUSION**

Defendant Navy Mutual's motion for summary judgment (Dkt. 35) is **GRANTED**.

Plaintiff Rebecca Augsburger's motion for partial summary judgment (Dkt. 49) is **DENIED**.

Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

DATED this 28th day of January, 2019.

_____
BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 32